LOCHREN, District Judge
(orally). In this case, if there were any question as to the sufficiency of the complaint at this time, the evidence has been presented and the case tried upon the theory that it is an action to set aside this mortgage to the American Loan & Trust Company, on the ground that the same was a preference in favor of the electric corporation, and contrary to the insolvent laws of the state; and, if there were any defect in the complaint (which I do not determine), I think an amendment ought to be allowed, so as to present the case in the pleadings as the parties have chosen to present it in their evidence and in the argument before the court.
*50 I think that counsel for complainant is correct in his position that this is not in any sense an action to rescind the conveyance, hut to have it declared void upon the ground that it was made in contravention of the provisions of the state insolvent law. It is brought by the receiver, representing and in the interest of the creditors; and he is not obliged, as a condition for obtaining the relief sought, to place the other party in statu quo, nor to return the money or securities which were parted with in making this conveyance. It seems that the Great Western Manufacturing Company commenced business in the beginning of the year 1893; and in December, 1891, its business came to an end by an entire collapse or failure, accompanied at the time with attempts to give preferences to certain creditors,—-a Mrs. Lamb, in whose favor judgment had been confessed, and a Chicago creditor, to whom securities were turned over at the time. Therefore it is not strange that the creditors should look with suspicion upon a mortgage of this kind, given so recently before the failure, and in favor of a corporation which had been a creditor of the Great Western Manufacturing Company to a considerable amount. The conveyance, being executed so near the time of the collapse of the mortgagor, would naturally raise a suspicion as to the character of the conveyance itself. The question now before the court is as to the character of this conveyance, in view of the evidence in the case, which appears to be very full -and exhaustive. Our statute, as cited in complainant’s brief, recites that:
“Conveyances and payments made and securities given by any insolvent debtor or a debtor in contemplation of insolvency, within ninety days of making an assignment, as provided by section one of this act, with a view of giving a preference to any creditor upon a pre-existing debt, or to any persons under liability for such debtor, over another, shall be void as to all creditors or persons receiving the same, who shall have reasonable cause to believe that such debtor was insolvent.” Gen. St. Minn. 1894, § 4243.
In order to determine the character of the conveyance which is attacked in this suit, it is necessary to consider the condition of the parties, the negotiations between them, and the circumstances under which these negotiations were had. It appears that the Great Western Manufacturing Company was engaged in the manufacture of goods connected with the use of electricity, and was also trading in similar goods purchased from other manufacturers or dealers, and sold by the company in its stores in Chicago, St. Louis, and perhaps Duluth; so that it was to a certain extent a trading, and not exclusively a manufacturing, concern, and it is possible, therefore, that the law referred to by counsel as to technical insolvency would apply to a corporation of this kind,-—that is, it would not be necessary that it should not have sufficient assets to pay its liabilities in the ordinary course of business if they were carefully administered, but insolvency would occur where there was an inability to pay its debts as they matured and were demanded. That would be an act of insolvency in the case of a trader, and possibly in a case of this kind. The evidence does show that this corporation was, perhaps, during the entire negotiations resulting in this mortgage, or, at any rate, before the execution of the mortgage, technically insolvent in the latter
*51 sense, and also that the same was known to the agent of the electric corporation, the beneficiary of the mortgage, before the negotiations were completed. It is necessary, beyond the fact of insolvency, to show that the creditor had reason to know of the insolvency; and, further, it is necessary to show an intent to give a preference to the creditor. It is argued on the part of counsel for complainant that it is only necessary that this should be the motive actuating the mortgagor, and that it is immaterial that the creditor for whose benefit the mortgage is made had any such purpose, intention, or knowledge. It would be rather extraordinary that a debtor should give a preference to a creditor without the knowledge and consent or participation of the creditor. But I hardly think that in a case of this kind it would make much difference. It might possibly do so where the creditor was a relative of, or where confidential or personal relations existed between him and, the debtor, so that the latter might have a peculiar regard for the creditor, and, without consulting him, do an act for his benefit which the creditor might not have adopted. But that is something beyond the ordinary course of business in matters of this kind; so that, in determining whether this mortgage was given by the debtor, the Great Western Manufacturing Company, for the purpose or with a view of giving a preference to this particular creditor, we have to consider the relation of the parties, and the circumstances of the transactions at the time they occurred. There is nothing in the relations of these parties, as disclosed by the evidence, which would show a probability that the debtor would act in the manner I have indicated, as might be done in case of relationship, or something that might cause the debtor to feel a more than ordinary interest in the affairs of the creditor. In this case the evidence discloses nothing more than the ordinary relation of debtor and creditor, and no particular reason why the debtor should favor this particular creditor more than any other creditor, aside from business reasons.
Ordinarily, in cases of preference, the creditor is the one who urges the giving of the security; is anxious that it be given hastily, and the contract be made immediately, so that the matter may be closed up and got out of the way. This case does not seem to have any of these characteristics about it. It does not appear that at the time of these negotiations there was any apprehension on the part of the creditor with respect to the indebtedness, although it does appear there was an indebtedness of some $52,000, $24,000 of which was due, and that at the time Mr. Johnson came to Chicago, and had a conference with Mr. Gilman on the subject, he was informed that the company was not prepared to make a payment of that amount at that time, or any part of the debt. But this does not appear to have created any anxiety on the part of Mr. Johnson. The debt of the electric company at that time was not unsecured, but was secured by the indorsement of the directors of the Great Western Manufacturing Company. It was also secured by the bonds of the Pond du Lac Company, and I think there is nothing in the case which shows that the electric corporation did not at that time feel itself entirely safe and secured. There does not appear to be anything in the action of the company that Mr. Jolmson then represented, and Mr. Bartlett later, which dis *52 closes any anxiety on that point. It appears that the electric corporation’s business, or, at any rate, a considerable portion of it, was making loans to concerns interested in manufacturing or handling electric goods, and also dealing in the securities of electric companies; and the proposition which resulted in the making of this mortgage, which is now attacked, does not seem to have come from the creditor, the electric corporation, but from the debtor, the Great Western Manufacturing Company. The object as expressed in the negotiations between the parties was not, as far as the testimony discloses, for the purpose of giving the creditor greater security than it already had, but rather with the purpose of releasing a portion of the creditor’s securities which it then held in its hands, so as to make the same available to the Great Western Manufacturing Company, for the purpose of raising other moneys to be used in the continuation of its business. It was stated that Mr. Gage, a banker in Chicago, would make a loan to a considerable amount upon these securities if they could be gotten from this electric corporation; and there was also in view the expected sale of the Fond du Lac property, for which, as was represented to the agent of the electric corporation, the Great Western Manufacturing' Company had a standing oiler of $100,000 (which, as all parties then understood it, would place the company in easy circumstances as far as cash was concerned); but the company desired to hold on to the property with the hope of realizing $150,000 from it. Under these circumstances, one object of the Great Western Company was to obtain control of these securities held by the electric corporation. The proposition was that the electric corporation should increase its loan by $30,000, and instead of keeping the security which it then had upon these Fond du Lac assets, which, if surrendered, could he promptly used by the Great Western Manufacturing Company, the latter should place a mortgage upon all its machinery, implements, plant, and real estate at Duluth, to cover the indebtedness of $52,000, and an additional loan of $30,000, which was requested of the electric corporation, and also cover $20,000 more of bonds, the sale of which would enable the mortgagor to realize something near that amount In ready money for its use. There does'not seem to have been any haste in this matter made by the creditor, as in the ordinary case where he is seeking a preference, or where either of the parties are expecting insolvency. These negotiations commenced early in August, and extended until the 13th day of November, when the mortgage was finally executed. I believe it did not pass for some days later than that. In the meantime a statement of the affairs of the Great Western Manufacturing Company was made by Mr. Gilman, and transmitted to Mr. Bartlett, at Boston, who then represented the electric corporation, presenting the affairs of the company, as appears from the testimony, substantially as they were presented to Mr. Johnson. I do not see anything in the case from which I am convinced that the electric corporation regarded the affairs of the Great Western Manufacturing Company as being different from what they were represented to be in this communication to Mr. Bartlett, and by the personal representation made by Mr. Simonds in connection therewith. It does not appear to me that the evidence discloses *53 anything which would fairly give Mr. Johnson reason to apprehend that there was a crisis pending in the affairs of this company at that time or in the near future. They had representations from Mr. Gil-man that the Great Western Company could get $100,000 from the Fond du Lac Company at any time it chose to take it; that they had a standing offer for that amount; but, if they allowed that to stand in abeyance, and if these negotiations were carried out, they were to have $28,000 additional from the electric corporation, and they were to have $20,000 of bonds. There was an agreement by the creditors at Duluth that they would furnish $15,000 of other money. There was also a statement made by Mr. Gilman, with respect to the outstanding indebtedness, that much of it would not be pressed, but could be renewed, and was in the nature of permanent obligations, not pressing at the time.
It seems to me that this conveyance was not one which was asked by the creditor. It was one to which the creditor consented after a careful, painstaking examination of all the facts; and the purpose of it was not, as far as the creditor, and, I think, as far as the debtor, was concerned, to add to the security of the creditor, nor to give a preference, nor with the idea that the company was about to close up, but was made for the purpose of getting from the same creditor an additional loan,—getting from the same creditor certain securities which it had, and which the debtor supposed could be used in connection with its business, and from which, if the security could be changed, other moneys might be realized by the debtor. That, in my opinion, was the purpose of this negotiation. It was not carried on with any idea of closing up the business of the company, or of giving any preference at the time this conveyance was made. At the tune this mortgage was given, I think that there was nothing that would cause to either of the parties apprehension of the collapse of the Great Western Manufacturing Company, although that occurred very soon after the conveyance. Perhaps it was hastened by the fact that the mortgage was made, when, being placed upon file, it came to the knowledge of ihe other creditors. Times then were so panicky that I do not know but the court ought to take notice thereof with regard to the apprehension which a conveyance of that kind might convey to other creditors,—a mortgage made for the security of a corporation known t® have been a creditor to a considerable amount of the Great Western Company, without knowledge of the real facts in the case, without knowledge of the fact that other securities had been surrendered, which were more available to the debtor, and perhaps without knowledge that additional cash had been placed in the hands of the debtor by means of this arrangement. Whatever the reason was, the collapse came. It seems to me that it could hardly have been, and I do not think it was, anticipated. I am of the opinion, from this testimony, that it is not shown that this mortgage was made with a view of giving a preference, and judgment will be entered for the defendant. Ordered accordingly.